# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO JOSE JUAREZ FERNANDEZ,<br><br>           Plaintiff,<br><br>   v.<br><br>FERETI SEMAIA; ERNESTO SANTA CRUZ JR.; TODD M. LYONS; KRISTI NOEM; and PAMELA BONDI,<br><br>           Defendants. | Case No. 5:25-cv-03412-SPG-MBK<br><br>**ORDER GRANTING PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER [ECF NO. 1-3]** |

Before the Court is the Motion for Temporary Restraining Order and Preliminary Injunction Motion, (ECF No. 1-3 ("Motion")), filed by Petitioner Fernando Jose Juarez Fernandez ("Petitioner"). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion.

## I. BACKGROUND

The following allegations are taken from Petitioner's Petition for Writ of Habeas Corpus. (ECF No. 1 ("Petition")). Petitioner is a citizen of Nicaragua who entered the United States on December 18, 2022. (*Id.* ¶ 1). Petitioner was processed by Customs and

Border Patrol ("CBP") and released into the United States under conditional humanitarian parole. (*Id.*). Petitioner complied with instructions to report to an Immigrations and Customs Enforcement ("ICE") field office within 60 days and has subsequently complied with all orders from ICE. (*Id.* ¶ 2). Petitioner has no criminal history. (*Id.* ¶ 6). Petitioner is employed as a plumber's assistant and resides in Van Nuys, California with his girlfriend, who was pregnant and due to give birth in December 2025. (*Id.* ¶¶ 3-4).

On September 2, 2025, ICE officers arrived at Petitioner's home. (*Id.* ¶ 7). The officers informed Petitioner that they needed to take him to a police station to ask a few questions, and they denied that they were immigration officers when asked. (*Id.*). After Petitioner complied, the officers handcuffed Petitioner, escorted him into an unmarked vehicle, and took him to an ICE processing facility in downtown Los Angeles. (*Id.* ¶ 8). While Petitioner was informed by one of the processing officers that he had a right to a bond hearing before a judge, no such hearing was ever held. (*Id.* ¶ 9). After two days, Petitioner was transferred to the Adelanto ICE Processing Center, where he remains detained. (*Id.* ¶ 11).

Petitioner alleges that his detention has caused significant and ongoing harm, including sleep deprivation due to his conditions of confinement, inadequate nutritional intake, and insufficient access to hygiene. (*Id.* ¶ 12). Petitioner also states that he has experienced significant emotional distress because he has been separated from his pregnant girlfriend and may miss the birth of his child. (*Id.*). Petitioner is the primary support for his girlfriend, who has been unable to pay rent and was forced to vacate their shared apartment. (*Id.* ¶ 13). Petitioner's detention has also placed Petitioner at risk of losing his employment. (*Id.* ¶ 45).

Petitioner filed this Petition on December 17, 2025, raising procedural and due process claims under the Fifth Amendment. (*Id.* at 25-26). Petitioner seeks an order requiring his immediate release and an injunction prohibiting him from being re-arrested without a pre-deprivation hearing, among other forms of relief. (*Id.* at 27).

The Petition was accompanied by the instant Motion, which seeks substantially the same relief on an interim basis. (Mot. at 38). Respondents opposed the Motion on January 8, 2026. (ECF No. 8 ("Opposition")). Petitioner did not file a reply in support of the Motion.

## II.  LEGAL STANDARD

The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical.") (citation omitted). A plaintiff may secure a temporary restraining order upon establishing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

In deciding an application for a temporary restraining order, the court is permitted to consider the parties' pleadings, as well as declarations, affidavits, and exhibits submitted in support of and in opposition to the application. *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for a preliminary injunction, a court may consider and rely upon

declarations, affidavits, and exhibits submitted by the parties.") (citations omitted); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction); *BOKF, NA v. Estes*, 299 F. Supp. 3d 1117, 1122 (D. Nev. 2018). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citations omitted). The urgency of the relief sought necessitates a prompt determination and can make it difficult to obtain admissible evidence. *Id.*

### III. DISCUSSION

As an initial matter, Respondents effectively concede that Petitioner is entitled to a bond hearing before an immigration judge, at which he would be entitled to release on bond absent reason to believe that he is either a flight risk or a danger to the community. *See* (Opp. at 2, 4-6). This concession is mandated by federal regulations. *See* 8 C.F.R. § 236.1(d)(1); *see also Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) ("Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention."). Moreover, Respondents acknowledge that Petitioner is a member of the Bond Eligible Class certified in *Maldonado Bautista v. Santacruz,* No. 5:25-cv-01873-SSS-BFM (C.D. Cal. Nov. 25, 2025). Thus, there is no dispute that Petitioner is entitled to a bond hearing and that he has been erroneously denied this right.[1] At a minimum then, Petitioner is entitled to an order requiring Respondents to provide him with a bond hearing.

---

[1] Notwithstanding the lack of dispute on this point, Respondents fail to explain why they have continued to hold Petitioner without bond for more than four months, in violation of Petitioner's rights. The Court is deeply disturbed by Respondents' emerging pattern, in this and other cases before this Court, of detaining individuals without bond, only to later concede when pressed by a lawsuit that they lacked any justification for doing so. To the extent Respondents recognize that they are violating the law, they need not wait for a court order, or even a lawsuit, to correct their behavior.

However, because Petitioner seeks more comprehensive forms of relief, the Court will now consider Petitioner's Motion under the *Winter* factors.

### A. Likelihood of Success on the Merits

Petitioner raises claims under both procedural and substantive due process. Because the Court finds that Petitioner is likely to succeed on his procedural due process claim, the Court does not reach the substantive due process claim.

#### 1. Deprivation of a Protected Liberty Interest

To make out a valid procedural due process claim, a plaintiff must, as a threshold matter, show "a deprivation of a constitutionally protected liberty or property interest." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). Here, Petitioner argues that he has a protected liberty interest in his freedom from re-incarceration following his initial release on his own recognizance. Petitioner argues that he has relied on an "implicit promise" that his parole would only be revoked if he violated the conditions of his release. (Mot. at 25 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)). Because he has complied with all requirements, Petitioner argues that he has been arbitrarily deprived of this liberty interest.

The Court agrees that Petitioner has a liberty interest in his freedom from re-incarceration. As the Supreme Court has explained, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The protection afforded by the Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693. In a variety of contexts, the Supreme Court has repeatedly found that individuals possess a protected liberty interest against re-incarceration following even a conditional release from imprisonment. *See, e.g., Morrissey*, 408 U.S. at 482 (finding protected liberty interest in revocation of parole); *Young v. Harper*, 520 U.S. 143, 147-49 (1997) (same, in preparole context); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context).

*Morrissey* is instructive. *See Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) ("Courts have resolved the issue by 'comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*.'") (quoting *Holcomb v. Lykens*, 337 F.3d 217, 221 (2d Cir. 2003)). There, in answering the question of whether "the requirements of due process in general apply to parole revocations," the Court looked to "the nature of the interest of the parolee in his continued liberty." *Morrissey*, 408 U.S. at 481-82. The Court observed that a parolee's release "enables him to do a wide range of things open to persons who have never been convicted of any crime," such as being "gainfully employed," spending time "with family and friends," and "form[ing] the other enduring attachments of normal life." *Id.* at 482. In forming these attachments, the Court noted that "[t]he parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The Court further noted that, while a parolee is subject to "many restrictions not applicable to other citizens, his condition is very different from that of confinement in prison," such that a parolee "may be living a relatively normal life at the time he is faced with revocation." *Id.* Based on the nature of the conditional release, the Court concluded that a parolee's "liberty is valuable and must be seen as within the protection of the" Due Process Clause. *Id.*

The same is true here. In the years since he received humanitarian parole, Petitioner has obtained steady employment; spent time "with family and friends," including his mother, brother, and aunt; and "form[ed] the other enduring attachments of normal life," including starting a family with his girlfriend. Petitioner attests that he has become deeply involved in his community, volunteering his time to help fix shelters for unhoused people and regularly attending services at a Catholic church in his neighborhood. (Mot. at 27). In other words, Petitioner's parole has enabled him to live "a relatively normal life," and "his condition is very different from that of confinement in a prison," such that the sudden loss of his freedom "inflicts a 'grievous loss' on" Petitioner and his family. *Morrissey*, 408 U.S. at 482. Under these circumstances, Petitioner has a protected liberty interest in his

freedom from re-incarceration. Other district courts in this Circuit have reached the same conclusion under similar circumstances. *See, e.g.*, *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody."); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) ("Just as people on preparole, parole, and probation status have a liberty interest, so too does Ortega have a liberty interest in remaining out of custody on bond."); *Guillermo M.R. v. Kaiser*, 791 F. Supp. 3d 1021, 1029 (N.D. Cal. 2025) ("[T]he liberty interest that arises upon release [from immigration detention] is *inherent* in the Due Process Clause." (internal quotation marks and citation omitted)); *J.O.L.R. v. Wofford*, No. 1:25-cv-01241-KES-SKO (HC), 2025 WL 2718631, at *4 (E.D. Cal. Sept. 23, 2025) ("The court finds that petitioner has a protected liberty interest in his release.").

Petitioner's re-detention deprived him of this protected liberty interest. Petitioner was arrested by ICE on September 2, 2025, and has remained detained in an ICE facility since that date. It is undisputed that Petitioner complied with all requirements of his humanitarian parole prior to his detention. Nor is there any contention that Petitioner is either a flight risk or a danger to his community. As the Supreme Court has explained, civil detention is permitted only in "certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (internal quotation marks and citations omitted). In the civil immigration context, the only such recognized interests are "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." *Id.* (alterations omitted). In previously releasing Petitioner on humanitarian parole, the Government necessarily made a determination that Petitioner is neither a flight risk nor a danger to his community. *See* 8 C.F.R. § 212.5(b) (permitting humanitarian parole "on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,' *provided the aliens*

*present neither a security risk nor a risk of absconding*" (emphasis added)).[2] By revoking Petitioner's parole without a parole violation or a showing of changed circumstances as to his risk of flight or danger, Respondents have violated the "implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Morrissey*, 408 U.S. at 482. Thus, the termination of Petitioner's liberty "calls for some orderly process." *Id.*

In arguing otherwise, Respondents rely on the text of § 1226(b), which provides that "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). As an initial matter, however, Respondents have not shown that there exists any "original warrant" as to Petitioner, or that Petitioner was subject to parole "under subsection (a)" of § 1226. Instead, it appears that Petitioner was subject to humanitarian parole under 8 U.S.C. § 1182(d)(5). Respondents also point to regulations governing humanitarian parole, which provide that, "[u]pon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5(e)(2)(i). But Respondents have not shown compliance with these procedural requirements, as they point to no determination by an authorized official that "neither humanitarian reasons nor public benefit warrants" Petitioner's continued presence in the United States, nor do they show that they provided Petitioner with "written notice" of such a determination. Thus, Respondents have failed to identify any statutory or regulatory authorization for Petitioner's detention.

---

[2] To the extent Petitioner was instead released on conditional parole under 8 U.S.C. § 1226(a), regulations require the same determination. *See* 8 C.F.R. § 236.1(c)(8) (permitting release of an alien from custody only upon a determination "that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding").

Even if Petitioner's detention were statutorily authorized, however, the discretionary authority provided by § 1226(b) and related regulations must still be exercised consistent with the requirements of due process. "[T]he fact that a decision-making process involves discretion does not prevent an individual from having a protectable liberty interest." *Ortega*, 415 F. Supp. 3d at 969. As discussed above, having been detained and released on humanitarian parole following a determination that he posed neither a flight risk nor a danger to the community, Petitioner has a protected liberty interest in his freedom from re-incarceration. In depriving Petitioner of this interest, Respondents must comply with the requirements of due process. The Court will now turn to the question of what process Petitioner is due before the Government may terminate his liberty.

### 2. What Process Is Due

To determine what procedural protections an individual is owed in the event of a government deprivation of a protected liberty interest, courts balance three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest and the value of additional procedural safeguards; and (3) the countervailing government interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Petitioner argues that he is entitled to a pre-deprivation hearing, at which the Government would bear the burden of showing some changed circumstances that justify his re-detention. (Mot. at 22-23). Respondents argue that the appropriate remedy is the post-deprivation bond hearing provided for in 8 C.F.R. § 236.1(d)(1). (Opp. at 4-5).

Beginning with the first factor, the Court finds that Petitioner has a substantial private interest in his continued liberty. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also Zadvydas*, 533 U.S. at 690. As discussed above, in reliance on the terms of his parole, Petitioner has, for more than two years, lived a "relatively normal life," *Morrissey*, 408 U.S. at 482, obtaining steady employment, establishing significant ties to his community, and starting a family. As Petitioner attests, he is the primary provider for his pregnant girlfriend, and, as a direct result of Petitioner's re-incarceration,

Petitioner's girlfriend has been forced to vacate their shared apartment. It also appears that, as a result of his incarceration, Petitioner may have missed the birth of his child, who was due in December 2025. Petitioner also faces the risk of losing his job, which would further endanger his and his family's wellbeing. In taking on these responsibilities, Petitioner "justifiably relied on the government's implied promise" that he would not be re-detained absent some change in circumstances, such as a violation of the terms of his parole, a change in the status of his humanitarian release, or a new reason to believe that he poses either a flight risk or a danger to the community. *Pinchi*, 792 F. Supp. 3d at 1034-35; *see Morrissey*, 408 U.S. at 482. Under such circumstances, the revocation of Petitioner's freedom inflicts a "grievous loss" on Petitioner and his family. *Morrissey*, 408 U.S. at 482.

On the second factor, the fact that Petitioner has been held for more than four months without *any* process strongly suggests that the risk of an erroneous deprivation of liberty is high. As discussed above, Respondents offer no evidence of compliance with the written notice requirement of 8 C.F.R. § 212.5(e)(2)(i), and they concede that Petitioner has not been provided the post-deprivation bond hearing required by 8 C.F.R. § 236.1(d)(1). "Where, as here, the petitioner has not received any bond or custody hearing, the risk of an erroneous deprivation of liberty is high because neither the government nor [Petitioner] has had an opportunity to determine whether there is any valid basis for [his] detention." *Pinchi*, 792 F. Supp. 3d at 1035 (internal quotation marks, citation, and alterations omitted). Furthermore, as explained above, civil immigration detention under these circumstances is permitted only to prevent flight or protect against a danger to the community. *See Zadvydas*, 533 U.S. at 690. Respondents previously found that Petitioner fell into neither of these categories, *see* 8 C.F.R. § 212.5(b), and they offer no evidence to suggest that circumstances have since changed. The evidence before the Court—including the fact that Petitioner has obtained steady employment, has significant family ties to this area, and has committed no criminal offenses—suggests that Respondents will be unlikely to make this showing. Further process would correct any erroneous deprivation, as Petitioner would be

afforded the opportunity to show that he continues to pose no risk of flight or danger to the community. Thus, it appears that Petitioner faces a high likelihood of erroneous deprivation of his liberty and that further process would mitigate this risk.

These two factors strongly suggest that a pre-deprivation hearing should be required under the circumstances of Petitioner's case. "[T]he root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). While there may be "special case[s]" that support immediate detention, *see Zinermon v. Burch*, 494 U.S. 113, 127 (1990), Respondents have identified no reason to think such urgency was required here. *See Guillermo M.R.*, 791 F. Supp. 3d at 1036 ("[A]bsent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due process, particularly where an individual has been released on bond by an IJ."). The Government has previously determined that Petitioner poses neither a flight risk nor a danger to the community, and Respondents offer no reason to think that determination has changed. Absent a demonstrated need for urgency, a post-deprivation hearing would not sufficiently protect Petitioner's liberty interest because his interim detention would still cause the same harms suffered here—the loss of his freedom, the loss of his income and potential loss of his employment, and the inability to provide for his family—without any countervailing benefit. The Supreme Court has found that pre-deprivation process is required for revocation of parole, preparole, and probation. *See Morrissey*, 408 U.S. at 487-88 ("There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority."); *see also Young*, 520 U.S. at 152-53; *Gagnon*, 411 U.S. at 782. Here, given the civil context, which permits detention only in "certain special and narrow nonpunitive circumstances," *Zadvydas*, 533 U.S. at 690 (internal quotation marks and citation omitted), Petitioner's "liberty interest is arguably greater than the interest of parolees in *Morrissey*," *Ortega*, 415 F. Supp. 3d at 970. For individuals, like Petitioner, who have already been determined to pose neither a flight risk nor a danger to the community, the risk of erroneous deprivation and the value

of pre-deprivation process are particularly high. Furthermore, Petitioner's experience demonstrates the risk inherent in a post-deprivation system—that an individual will, whether because of administrative overburden or intentional malfeasance, be detained indefinitely without *any* process.

Respondents have failed to identify any countervailing governmental interest whatsoever, let alone one that would outweigh Petitioner's interest in a pre-deprivation hearing. In the absence of any argument, the Court can only guess what interests might be served here. In general, the Government has an interest in the orderly enforcement of its immigration laws. However, Respondents have made no showing that providing a pre-deprivation hearing under these circumstances would interfere with the Government's enforcement of its immigration laws. Since the Government has already determined that Petitioner does not pose a flight risk, there is no reason to think that Petitioner would not comply with an order to appear for a hearing on the revocation of parole. As to the cost of providing such a hearing, Respondents have identified no reason why a pre-deprivation hearing would be any more administratively or financially taxing than the post-deprivation hearing that is already required. *See Guillermo M.R.*, 791 F. Supp. 3d at 1037 ("[T]he immigration courts would likely hear Petitioner's challenge to his re-detention either way, whether on a pre-deprivation or post-deprivation basis, so there is no cost savings from waiting to hold the hearing."). Furthermore, "a pre-deprivation hearing could reduce administrative costs by potentially avoiding an erroneous deprivation of liberty, which would save the costs of unnecessary detention." *Id.* Finally, the fact that existing regulations do not provide for such process is not determinative, because "due process requires the government to identify some interest beyond its own administrative practices to justify depriving an individual of her liberty without any pre-deprivation protections." *Pinchi*, 792 F. Supp. 3d at 1036. "Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest." *Id.*

The cases cited by Respondents, *Martinez Hernandez v. Andrews*, No. 1:25-CV-01035 JLT HBK, 2025 WL 2495767 (E.D. Cal. Aug. 28, 2025), and *Lagara Mayo v. Semaia,* 5:25-cv-03003-MEMF-E, ECF No. 12 (C.D. Cal. Dec. 9, 2025), do not support a contrary result. In *Martinez Hernandez*, the court found a due process violation based on the re-detention of an individual who was previously released on his own recognizance under 8 U.S.C. § 1226, but concluded that a "prompt, post-deprivation" bond hearing was sufficient to satisfy due process. 2025 WL 2495767, at *12. However, in so concluding, the court found evidence that "Petitioner repeatedly violated the terms of his parole," thus suggesting that "providing Petitioner with notice and a pre-deprivation hearing would have been impracticable and/or would have motivated his flight." *Id.* Respondents here have put forth no such evidence of urgent concerns, nor have they provided any evidence that Petitioner poses a flight risk. In *Lagara Mayo*, the court found no risk of erroneous deprivation because the petitioner had been convicted of multiple crimes since his prior release, such that he was unlikely to show compliance with his conditions of release. 5:25-cv-03003-MEMF-E, ECF No. 12, at 9. Here, by contrast, the risk of erroneous deprivation is high because Petitioner has been afforded no process and there is no evidence of any changed circumstances that would justify his re-detention. Finally, unlike the cited cases involving challenges to the legality of an arrest, Petitioner here is challenging the fact of his detention, which is clearly cognizable. *Cf. Marroquin-Salazar v. Noem*, 5:25-cv-02367-FLA-JC, ECF No. 9-1 (C.D. Cal. Oct. 24, 2025) (rejecting Fourth Amendment challenge to detention because "a finding that [the petitioner's] arrest was unlawful would not entitle her to release from custody").

Based on the above, the Court concludes that Petitioner has a protected liberty interest in his continued freedom following his release on humanitarian parole. Under the circumstances presented here, the Court finds that due process requires that Petitioner be provided a pre-deprivation hearing to show that a change in circumstances justifies the revocation of his liberty. Accordingly, Petitioner is likely to succeed on the merits of his procedural due process claim.

### B. Irreparable Harm

Next, the Court finds that Petitioner has established that he will suffer irreparable harm in the absence of a temporary restraining order. "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury," including those "imposed on anyone subject to immigration detention." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (citation omitted). As the Supreme Court has explained, "[t]he time spent in jail . . . has a detrimental impact on the individual," often resulting in the "loss of a job" and disruptions to "family life." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). Moreover, the Ninth Circuit has recognized the "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. Petitioner has suffered all these harms. Petitioner attests that he has suffered "emotional distress and constant worry about his pregnant girlfriend, sleep deprivation due to the conditions of confinement, inadequate nutritional intake, leaving him chronically hungry, and limited access to hygiene." (Compl. ¶ 12). Petitioner further attests that his detention "jeopardized his employment, housing stability, and his girlfriend's ability to prepare for their child's arrival," as she "has had to leave their apartment, unable to pay rent without [Petitioner's] support." (*Id.* ¶ 13). In the absence of any contrary arguments, the Court finds that Petitioner will suffer irreparable harm in the absence of emergency relief.

### C. Balance of Equities and Public Interest

The balance of equities and public interest merge when the Government is the party opposing the relief sought. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed above, Petitioner faces not only the deprivation of his constitutional rights, but also serious interruptions to his family life, housing, and employment. Respondents have identified no countervailing harm or public interest. As the Ninth Circuit has explained, "it is always in the public interest to prevent the violation of a party's constitutional rights," and "[t]he government also cannot reasonably assert that it is harmed in any legally cognizable sense

by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

In sum, Petitioner has shown that he is likely to succeed on the merits of his due process claim and that he and his family will suffer significant hardship absent injunctive relief, while Respondents have not shown any countervailing interests. On balance, the *Winter* factors weigh in Petitioner's favor. The Court thus GRANTS Petitioner's Motion.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion and ORDERS as follows:

1. Respondents are ORDERED to release Petitioner immediately;
2. Respondents are temporarily ENJOINED AND RESTRAINED from re-detaining Petitioner unless they demonstrate, by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker, that there has been a material change in circumstances justifying Petitioner's re-detention;
3. Respondents are ORDERED TO SHOW CAUSE in writing no later than seven (7) days from the date of this Order why the Court should not issue a preliminary injunction. Petitioner may file a Reply no later than ten (10) days from the date of this Order. The Court sets a hearing on whether a preliminary injunction should issue for Wednesday, January 28, at 10:00 a.m. The Court will accept a stipulated briefing schedule extending these dates on the condition that the parties agree to an extension of the TRO.

**IT IS SO ORDERED.**

DATED:  January 13, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE